**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **CHARLES R. CAMPBELL,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **1:09-CV-314-TWP-DML** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| **Defendant.** | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Charles R. Campbell, appeals from a Social Security Administration ("SSA") final determination denying his application for Supplemental Security Income ("SSI"). He filed his application for SSI on June 28, 2004, claiming that he has been disabled since November 4, 1993 due to disorders of the lumbar spine, diabetes, hypertension, an adjustment disorder and a depressed mood. The SSA turned his claim down initially and on reconsideration. At the request of Plaintiff an Administrative Law Judge ("ALJ") conducted a hearing in August, 2007. The ALJ handed down his ruling in October 2007, finding that Plaintiff was not disabled and not entitled to benefits. The Appeals Council denied Plaintiff's request for review, which makes the ALJ's decision the final decision of the SSA Commissioner, Defendant Michael Astrue, and appealable to this Court. Plaintiff has been represented by legal counsel throughout the proceedings, including this judicial review.

### STANDARD OF REVIEW

Our standard of review is deferential:   courts must uphold decisions of the Commissioner if his factual findings are supported by substantial evidence in the record and no material error of law has occurred. 42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir.2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it constitutes substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir.2004).  As the Seventh Circuit has noted, this limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations. *Young v. Barnhart*, 362 F.3d 995, 1001.

The ALJ's findings of fact, if supported by substantial evidence, are conclusive; however,  "[i]n coming to his decision ... the ALJ must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir.2003).  The ALJ's decision must also demonstrate the path of reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.1996).  While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his through an adequate discussion, otherwise it will be

remanded.   *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir.2005); *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir.2001).

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(3)(A).   A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any othis kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3) (B).   The combined effect of all of a claimant's impairments shall be considered throughout the disability determination process. 42 USC §§ 423(d)(2)(B) and 1382a(a)(3)(G).

The SSA has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.   20 C.F.R. §§ 404.1520 and 416.924.   If disability status can be determined at any step in the sequence, an application will not be reviewed further.   *Id*.   At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled.   At the second step, if the claimant's impairments are not severe, then he is not disabled.   A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.924(c).   Third, if the claimant's impairments, either singly or

3

in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Administration has pre-determined are disabling. 20 C.F.R. § 404.1525.  If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. §§ 404.1545 and 416.945.  At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work in the relevant economy.

The burden rests on the claimant to establish steps one through four; the burden then shifts to the Commissioner at step five to establish that there are jobs that the claimant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir.2004).

### *FACTUAL AND MEDICAL HISTORY*

Plaintiff was born in December 1958 and the record shows that he was employed in various manual labor and management positions from 1979 through 1993.  He had no reported earnings from 1994 through 1998.  He began working again in 1999 and continued to work through 2002, when he claimed he had to quit working as a maintenance manager

because of his health.  He has worked for and helped manage grocery and convenience stores, worked in the fast food industry and spent time as a maintenance man and a welder. He testified at the hearing before the ALJ that since becoming unemployed he occasionally drives his truck around to collect scrap aluminum for recycling and to look for items that people have thrown away that he might be able to fix and sell, but over time he has done this less frequently because driving can cause him to experience more pain.

Plaintiff testified before the ALJ  that his back, knee and hand pain are too great to allow him to work at any gainful employment.  He walks using two canes and he can walk no more than a block and needs to sit often to relieve pain.  He testified that he could only use the computer for about ten to fifteen minutes because of hand and hip pain and that it would take him a couple of days to recover after working on the computer for that amount of time. When asked whether he could perform a job such as a security monitor, which would involve sitting and watching television screens, Plaintiff testified that the primary impediment would be getting to work.  He also claimed that it would be hard for him to focus on the television screens because his medications made him groggy and dizzy.

Plaintiff claims a disability onset date of November 4, 1993; however, there is no medical evidence in the record predating June 1995, when he presented to Dr. Chad Lamb of Anderson, Indiana, as a new patient.  His complaint at the time was of pain in his hands and left shoulder with a history of chronic back pain.  X-rays of Plaintiff's hand were negative.  After engaging in the physical therapy recommended by Dr. Lamb for what the

doctor described as a rotator cuff weakness, Plaintiff returned in July 1995 with a continued complaint of hand pain, but with some significant progress to his shoulder.   He also complained at that time of a tingling or paresthesias in both legs which dated  back several months.  Dr. Lamb referred Plaintiff for an orthopaedic evaluation of his shoulder and his "carpal tunnel syndrome."  The paresthesias was to be further evaluated through another appointment.

In August, Plaintiff saw Dr. David Graybill, to whom he had been referred for orthopaedic examination.  Dr. Graybill administered an injection to Plaintiff's shoulder to address the arthritis and nerve impingement he diagnosed and he also confirmed Dr. Lamb's opinion that Plaintiff's hand pain was likely the result of carpal tunnel syndrome.  Plaintiff then returned to Dr. Lamb's office to inquire about a weight loss program and received instruction on a low fat and cholesterol diet with a graduated exercise program.

Plaintiff saw Dr. Lamb a couple of times in 1996 for a cough and a sore throat, but had no complaints of any other acute medical problems.  Then, in May 1997, Plaintiff returned to Dr. Lamb to address a problem with his right knee "giving out" almost every other day.  Plaintiff stated that his knee pain had been developing over the course of the past few years.  Dr. Lamb found the knee to have a full range of motion, but diagnosed the problem as a likely ACL tear and offered an orthopaedic referral.  The referral led to  surgery on Plaintiff's right knee in June 1997, which was performed by Dr. Graybill.  Despite Plaintiff's report of some occasional left-side chest pain, a pre-surgical EKG demonstrated

no significant cardiac symptoms.

According to a letter from Dr. Graybill to Dr. Lamb, the month following Plaintiff's knee surgery he went back to Dr. Graybill to discuss his chronic back pain and gauge the post-operative progress with his knee. Plaintiff indicated that his back pain began approximately five years prior when he fell off a stack of skids. Reviewing x-rays, Dr. Graybill described "some mild degenerative changes" in the lower back with a possible degenerative disk at the 3-4 level. Dr. Graybill recommended completing the knee rehabilitation before addressing Plaintiff's back issues.

In November 1997, Dr. Graybill reported Plaintiff's knee was dramatically improved with the "inside pain" gone. However, he also reported that Plaintiff had a chronic ACL tear and that he continued to have some "giving away" symptoms. Dr. Graybill wrote that he had recently been focusing on Plaintiff's complaint of chronic back pain which was exacerbated by physical activity. His impression was that Plaintiff had a potential degenerative disk problem with some arthritis and that he would not be able to return to employment as a manual laborer and should be considered for vocational rehabilitation. Dr. Graybill's November 18, 1997 letter, which was copied to the Disability Determination Bureau of the State of Indiana concluded:

> As far as his limitations currently, sitting is limited to about 20 to 30 minutes at a time, and with a short break he could continue this. Standing and walking are limited. As far as lifting, I think he would have a long-term lifting restriction of no more than five pounds and no repetitive lifting. Grasp and manipulation would be unlimited. Pushing and pulling would be limited to the

same as lifting.  Bending and squatting would be restricted, and I think he could not perform any extensive crawling or climbing.  Reaching above his shoulders would be unlimited to the best of my knowledge.  I have no problems with him driving or being around machinery.  Repetitive leg movements would be unrestricted.  Exposure to temperature changes, dust and gases, I know of no contraindication.  Caring for the normal personal needs and house work would be unlimited.

After obtaining a prescription for Darvocet to address his back pain earlier in the month, Plaintiff returned to Dr. Lamb's office on March 27, 1998, complaining of continued back pain and of his knees giving out.  Plaintiff reported to Dr. Lamb that because of his continued back pain and knee problems he did not think he could continue in the "Impact Program" which was a program he had started in order to help him obtain employment, but which was requiring him to sit for long periods of time in a classroom.  Dr. Lamb referred Plaintiff to Dr. Graybill for consideration of surgical intervention and also provided him with a written excuse to miss the Impact Program classes for six weeks.

In July 1998, Plaintiff expressed concerns to Dr. Lamb regarding osteoporosis because his father and his brother both developed osteoporosis in their 40's.  In October 1998, a bone density scan revealed osteoporosis of Plaintiff's lumbar spine and testing indicated that he had a low testosterone level.  Dr. Lamb's examination of Plaintiff demonstrated that he had a good range of motion in most joints.  The doctor opined that Plaintiff did have osteoporosis and hypotestosteronism issues and that his financial limitations were preventing him from paying for the medications and hormone replacements which would address these issues.  .

Dr. Lamb's notes indicate that in February 1999, Plaintiff was prescribed Miacalcin for his osteoporosis, and Depo-testosterone for his hypotestosteronism . In September 1999, Plaintiff saw Dr. Lamb for a routine follow-up and reported that he had returned to work on a part-time basis at a donut shop. He had some foot pain as a result of a recent fall, but reported no other acute complaints. A bone density scan revealed a slight increase in bone density in the lumbar spine when compared with the October 1998 scan, and bone density of the left hip was normal.

Dr. Lamb next saw Plaintiff for a follow-up exam in March 2000. Plaintiff stated that he felt that he his back had improved since taking the Miacalcin and that he had been able to work continuously since his last visit. Dr. Lamb noted that Plaintiff had developed hypertension and prescribed Toprol. He also noted that Plaintiff's testosterone injections were increased. In June 2000, Plaintiff reported feeling much better since his testosterone dosage was increased and Dr. Lamb noted that Plaintiff's hypertension medication provided good control. A routine visit in December 2000 included a report from Plaintiff that his back, hypertension and low testosterone problems were all improved through the medication program he was on. He did indicate that he was skipping the recommended colonoscopy because of the costs and the fact that his current employment provided no insurance. Dr. Lamb ordered a bone density scan which later revealed a decrease in Plaintiff's bone density since the September 1999 scan.

In June 2001, Plaintiff had no new complaints and again stated that he felt better since

starting on the testosterone medication, though he had good and bad days.  Dr. Lamb did note less than optimal control with regard to Plaintiff's blood pressure and increased his hypertension medication at that time.  A follow-up exam in  December 2001, included an account from Plaintiff that he was feeling great and nearly ten years younger.  He reported that he was working full-time as a maintenance person and optimistic that he would be able to fulfill his goal of owning some apartment buildings in the future.  In June 2002, Plaintiff called to cancel his appointment and Dr. Lamb's notes indicate that Plaintiff indicated he had been laid off from his job.

Plaintiff did not return to see Dr. Lamb until February 2003, when he rode his bike to an appointment to obtain additional bloodwork and a referral for another  bone density scan.  Other than elevated blood pressure, which the doctor thought could be due to his riding his bike to the appointment in extremely cold weather, Plaintiff had no acute complaints.  He reported that he was reading faster and thinking quicker and requested that he be tested for testosterone levels after stopping the injections because he thought the levels may have returned to normal.  However, later testing revealed a continued testosterone deficiency and the replacement injections were restarted.  A bone scan which was ordered revealed a significant mineral density increase from the January 2001 study.

In May 2003, Plaintiff reported that he was still unemployed and had quit taking his blood pressure medicine because of the expense.  A visit to Dr. Lamb on May 15, 2003 included Plaintiff's report that he was doing fairly well but having trouble affording his

medication.  He was given information on indigent pharmaceutical programs.  Since his last visit with Dr. Lamb, lab tests had yielded a diagnosis of diabetes and the doctor noted that he had a long discussion with the Plaintiff regarding his medications, diabetes and insulin issues and the effect of diet and exercise on his health conditions.  A follow-up visit in July 2003, yielded a report from Plaintiff that he was doing better and that he was riding his bike and walking.

In October 2003, Plaintiff had an appointment with Dr. Lamb to request that disability paperwork be completed.  He reported continued problems with back and joint pain and claimed he was unable to walk, lift, or do anything for a prolonged time frame.  In November 2003, Plaintiff saw Dr. Lamb with a complaint of acute low back pain which came on after he bent over to lift something.  On examination, Plaintiff exhibited mild tenderness without muscle spasm. Dr. Lamb noted that Plaintiff was walking with the assistance of canes and winced with nearly every move.  Plaintiff indicated he had little money and was not keeping his prescriptions filled.  As in the past, the doctor provided Plaintiff with medicine samples that were available in the office and sought to help him pursue charitable avenues to obtain additional prescription refills.

Plaintiff returned to Dr. Lamb's office in January 2004 claiming that he was taking his medication regularly, except for the testosterone, for which he had been unable to obtain

help in purchasing.  Dr. Lamb noted that the latest bone scan showed density improvement, but that Plaintiff's  blood sugar levels were up and he admitted to not checking them regularly.  Plaintiff claimed that he was unable to afford additional bloodwork at that time. His blood pressure seemed under control, but he complained of joint pain..  Plaintiff returned to Dr. Lamb's office in July of 2004 with additional disability paperwork to be completed by the doctor. At that time he reported that he felt like things were going fairly well. Plaintiffs's blood pressure remained elevated, likely due to the fact that he had run out of medicine a few days prior and was waiting for a shipment which was due in a few days.  The doctor also observed that Plaintiff was ambulating fairly well with the use of a cane.

Dr. Wail Bakdash conducted a consultative examination of Plaintiff in August 2004. Plaintiff reported that he had lower back pain that started in 1993, pain in both legs, diabetes, shoulder spurs, osteoporisis, hyperlipidemia, hypertension, and arthritis in his hands. He indicated that his current medications included Lipitor, Anaprox, Darvocet, Toprol, Lotensin, Miacalcin and Glucophage.  Plaintiff stated he could walk six blocks with his cane and climb one flight of stairs, and that he could walk some without his cane but needed a knee brace.

On examination, Dr. Badash observed that Plaintiff was able to get on and off the examination table without difficulty, his gait and posture were normal without ataxia or unsteadiness, he was able to stand on his heels and toes without difficulty, his spine was not tender, there was no swelling in his joints and he had a full range of motion.  His strength, reflexes, and sensation were reported as normal.  Dr. Bakdash noted that Plaintiff could

12

grasp, lift, carry, and manipulate objects with both hands, and could bend over without restriction and squat halfway. He also sat and stood normally. Doctor Badash indicated that his impression was that Plaintiff was suffering from lower back pain probably due to a degenerative disk, type II diabetes, hyperlipidemia, osteoporosis, obesity, and HTN.

On September 2, 2004 state agency personnel interviewed Plaintiff. The interview was initiated after Plaintiff had written on a medical history form that he had had suicidal ideations. He indicated that he occasionally had suicidal thoughts, but that his sister and daughter, with whom he lived, were aware of this and helped him when he became depressed regarding his physical ailments. He reported that he was capable of daily living activities, but needed frequent rests for pain. He could occasionally lift ten to fifteen pounds and was able to drive for short trips. Plaintiff said that he did his own shopping and showered and dressed himself daily. Daily activities included use of the computer, watching television and home exercises for his back. He had no complaints about his ability to interact and get along with others and stated that he drove around town for a few hours about three times a week, looking for things people were throwing away that he could collect and fix up for sale.

In September 2004, Dr. T. Crawford, a reviewing physician with the state agency, opined that Plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, stand or walk for about 6 hours in a 8-hour workday, sit for about 6 hours in an 8-hour workday, and engage in unlimited pushing or pulling of hand or foot controls. Dr. Crawford indicated that Plaintiff could frequently climb ramps or stairs, as well as balance,

13

stoop, kneel, and crouch; and could occasionally crawl and climb ladders, ropes, or scaffolds. No visual, environmental or manipulative limitations were ascribed.

In October 2004, Plaintiff was in a car accident and on December 16, 2004 he went to see Dr. Lamb, complaining of increased headaches and back pain. Through examination, Dr. Lamb detected some muscle spasm, but no vertebral tenderness, and Plaintiff's gait and strength were normal. An MRI of Plaintiff's back revealed mild changes from L3 through S1 and a CT scan of his head was sought. Pursuant to Dr. Lamb's referral, Plaintiff started physical therapy on December 27, 2004 and reported in January that this was helping his joints considerably. He also reported to Dr. Lamb in January that his headaches had been significantly relieved. On January 21, 2005, Plaintiff completed physical therapy, showing some progress, but continuing to experience constant pain. He reported that traction had helped him lie in bed better and he was instructed to continue his daily exercises at home and to use proper body mechanics with all daily activities.

At his February 15, 2005 appointment with Dr. Lamb, Plaintiff reported that overall he was doing better and that his back pain had improved to the point that he was back to his previous "baseline." Plaintiff also reported some numbness in his hands, left more than right, and Dr. Lamb noted that an x-ray from his previous visit had shown a healed fracture and minor arthritis. His blood pressure was under control and the doctor made no changes to Plaintiff's medication regimen, but additional prescription drug samples were given to Plaintiff to help ease his financial burden. At a routine follow-up in March 2005, Dr. Lamb

14

noted that testing in February had revealed poorly controlled diabetes, perhaps because Plaintiff was not checking his blood sugar regularly and was not sticking to the prescribed diet. Dr. Lamb encouraged Plaintiff to watch his diet and to exercise.

In June 2005, Plaintiff reported great difficulty in obtaining medications, despite being set up in patient assistance programs at the doctor's office and with pharmaceutical company assistance programs. Dr. Lamb noted that Plaintiff was unable to get his testosterone medication and was sporadically taking his Miacalcin. Plaintiff was not able to check his blood sugar regularly and was hesitant to get further blood work. He reported that he fell a couple of times and, as a result, had some pain in his shoulders, but had no other complaints. In December 2005, Dr. Lamb noted that Plaintiff was completely reliant on samples and was taking his medications haphazardly. Plaintiff's blood pressure was elevated because he was not taking the Lotensin which had been prescribed, and doctor Lamb indicated that he would rather switch Plaintiff to a blood pressure control drug for which they could rely on obtaining samples because that was the only way to assure that Plaintiff would be able to fill his prescription. It was noted that the Darvocet which was given to him had been controlling Plaintiff's pain, but that he continued to claim an inability to do repetitive leg motions or walk for any great distance.

In March 2006, Dr. Lamb administered a Tetanus shot because of Plaintiff's exposure to metals and he also provided Plaintiff with a prescription for twenty Vicodin tablets to take as necessary when his pain was at its worst. Dr. Lamb noted that Plaintiff's diabetes was

15

poorly controlled, secondary to medication noncompliance.  When he returned to see Dr. Lamb in September, 2006, Plaintiff reported that he felt fairly well despite ongoing joint pain.  He indicated that he had been able to obtain his medications more reliably and had been taking them more consistently.  Dr. Lamb noted a marked improvement with Plaintiff's diabetes as well, but noted that Plaintiff's blood pressure was elevated.

The final medical evidence, chronologically, is from Plaintiff's visit with Dr. Lamb in March 2007.  He was seeking refills of his medications and was getting by on samples that were provided to him.  Plaintiff reported getting some regular exercise from walking.  He denied any new bone pain and had no other acute complaints.  Dr. Lamb noted that Plaintiff's arthritis, diabetes, and hypertension were controlled by his medications, but that he was not checking his blood sugars on a regular basis.

At the hearing before the ALJ, Robert Barber was called as a vocational expert witness and  offered his testimony.  The ALJ asked him to consider an individual with Plaintiff's age, education, and work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for about 2 hours in an 8-hour day; sit for about 6 hours in an 8-hour day with the option to alternate position for one or two minutes each hour; who required no more than occasional balancing, stooping, kneeling, crouching, or crawling; and who should avoid work at unprotected heights, around dangerous machinery or operating a motor vehicle, and around open flames or large bodies of water. The vocational expert testified that Plaintiff would be unable to perform his past work, but

that he could perform other work and identified the following sedentary jobs: scheduling clerk, mail sorter, time keeper, assembler, security guard surveillance monitor, and telephone quotation clerk.

### *ALJ DETERMINATION*

After considering all the evidence, including the testimony at the hearing, the ALJ determined that Plaintiff "has not been under a disability within the meaning of the Social Security Act since June 28, 2004, the date the application was filed." In so doing, he made the following findings:

1. The claimant has not engaged in substantial gainful activity since June 28, 2004,the application date.
2. The claimant has disorders of the lumbar spine (discogenic and degenerative), diabetes, hypertension, an adjustment disorder and a depressed mood, impairments which are defined as impairments or a combination of impairments which significantly limit (have more than a minimal effect on) an individual's ability to perform basic work activities. The claimant's condition produces limitations, which meet this definition of "severe" as will be clear from the discussion of the claimant's residual functional capacity later in this decision.
3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work, including lifting and carrying 20 pounds occasionally and 10 pounds frequently, stand and walk for 2 of 8 hours and sit for 6 of 8 hours provided the work accommodates an option to alternate into a sitting or standing position for 1-2 minutes each hour and required no more than occasional climbing of stairs and ramps and no climbing of ropes, ladders, or scaffolds and no more than occasional balancing, stooping, kneeling, crouching or crawling. The individual should avoid work at unprotected heights, around dangerous moving machinery, or operating a motor vehicle or being around open flames

and large bodies of water.

5.    The claimant is unable to perform any past relevant work.

6.    The claimant was born on December 27, 1958 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.    The claimant has at least a high school education and is able to communicate in English.

8.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferrable job skills.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security Act since June 28, 2004, the date the application was filed.

In seeking judicial review of the determination, Plaintiff assigns three errors: (1) improper analysis of Plaintiff's credibility; (2) failure to reference and discuss contrary medical evidence as required by SSR 96-8p; and (3) improper reliance on excusable noncompliance with prescribed treatment by medication. I find some merit in Plaintiff's arguments with respect to numbers (1) and (3).  The issue of Plaintiff's credibility and his failure to consistently take the prescription drugs his doctor has prescribed for his various conditions, arises out of the ALJ's discussion of his fourth finding, that being Plaintiff's RFC, which the ALJ opines is sufficient for Plaintiff to perform other work available in the economy.

An ALJ must supply specific reasons for finding that a disability applicant's testimony is not believable.  *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).  In this

18

instance the ALJ makes two statements within the discussion of his fourth finding regarding

Plaintiff's credibility, the first (and only understandable reference[1]) coming after he set forth

Plaintiff's reported problems with his knees collapsing, his back pain, his diabetes related

need for glasses, and his inability to ride a bike at times due to his foot, knee, back and hip

pain:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

It is not clear from this excerpted language whether the ALJ is referencing the claimant's

description of restrictions that the ALJ set out in his opinion immediately prior or whether

he was referring to other of the Plaintiff's claims which the ALJ references in subsequent

paragraphs.

The subsequent paragraphs contain some discussion that hints at why the ALJ has

the impression that Plaintiff's allegations and testimony lacked veracity, but the discussion

provides very little insight and clearly not enough to comply with the requirements of SSR

96-7p, which provides that the ALJ explain why the claimant's allegations of functional

---

[1]The second statement from the ALJ regarding credibility is set forth as the last sentence in his discussion under the fourth finding.

> *Furthermore, after considering the whole of the evidence, the claimant's subjective allegations lack credibility to the extent that they lack to describe restrictions that would support a finding of more restrictive limitations.*

Unfortunately, whether the result of a typo, grammatical mistake or other more substantive mistake, the sentence is not clear.

limitations and restrictions are not consistent with the objective medical evidence.

In discussing claimant's complaints of headaches and dizziness, the ALJ points out that an MRI and CT scan of claimant's brain and head respectively, were unremarkable. While a finding from one of those diagnostic tests may have explained the source of the headache complaints, the lack of such a finding would not necessarily impinge on claimant's credibility. The ALJ also notes that despite Plaintiff's claim of back pain he admits to regularly walking, stretching and using a total gym. We question first the impeachment value of those admissions, considering that all of those activities could be engaged in to some degree regardless of pain. Further, while Plaintiff has never denied being able to walk or stretch, he has clearly indicated that he is extremely limited in the scope of those activities and those limitation descriptions are severe enough that, if true, they would provide reason to question his ability to engage in even sedentary occupations.

It appears that the ALJ may also have questioned Plaintiff's claim that he was having financial difficulties obtaining his medications. He states, after noting Plaintiff's claim of financial difficulties, that a December 2005 report revealed that the claimant was using sample medications. The use of sample medication is hardly inconsistent with the Plaintiff having financial difficulties in obtaining medicine. Moreover, the records from Dr. Lamb are replete with references to Plaintiff's difficulties in affording his prescriptions, the efforts at the doctor's office to enroll Plaintiff in various assistance programs and the provision to him of drug samples when such samples were available, all  because of the increase in

debilitating symptoms suffered by Plaintiff when he went without his medicines ( a topic we shall discuss momentarily).

In the end, I am of the opinion that the ALJ failed to adequately reference the evidence of record and any observations he may have made during the hearing which support his conclusion that Plaintiff's testimony and allegations as to physical limitations and restrictions lacked credibility. What I find intertwined with this credibility assessment and equally concerning is the ALJ's apparent recognition of Plaintiff's difficulties in consistently obtaining the medications prescribed for him, but his failure to reconcile such information with his discrediting of Plaintiff for Plaintiff's failure to comply with treatment. The specific statements of the ALJ which spawn concern are set forth below.

> The undersigned is cognizant that the medical reports reveal a myriad of ailments from joint pains to headaches but the [sic] all the reports seem to indicate that with regular use of prescribed medications the claimant's ailments are controlled and that regular use had been difficult because of financial difficulties. While this is an incredibly unfortunate circumstance the undersigned cannot ignore the fact that the claimant's ailments are not as severe as he has described when compliant with treatment.

In 1982 the administrative agency for Social Security published a ruling, SSR 82-59, which sets forth the conditions under which it can be determined that an individual has unjustifiably failed to follow prescribed treatment. The ruling also describes justifiable failures to obtain treatment including the following:
> ...
> 4. The individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable.

21

Although a free or subsidized source of treatment is often available, the claim may be allowed where such treatment is not reasonably available in the local community. All possible resources (e.g., clinics, charitable and public assistance agencies, etc.), must be explored. Contacts with such resources and the claimant's financial circumstances must be documented. Where treatment is not available, the case will be referred to VR.

In this case, Dr. Lamb's records are replete with references to Plaintiff's poor financial situation and the efforts made to obtain charitable assistance and sample medications, which resulted in both failures and successes (i.e steroid replacements unavailable through community assistance or charitable sources, but assistance received for Glucophage). Despite the ALJ's mention of the " unfortunate circumstance" and apparent recognition of the financial difficulties experienced by Plaintiff in regularly obtaining his medications, he provides no analysis of whether such failure to follow prescribed treatment was excusable. If a claimant cannot afford the prescribed treatment for his condition, "the condition that is disabling in fact continues to be disabling in law." *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir. 1987). An ALJ cannot ignore the economic realities when a claimant is unable to afford treatment and must not consider the failure to follow treatment as a factor in the determination of the severity of the claimant's impairment if in the final analysis he concludes that the failure is justified because of a lack of funds. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988)*;; Dover v. Bowen*, 784 f.2d 335, 337 (8th Cir. 1986).

The Commissioner argues that the ALJ did not deny Plaintiff disability because of his failure to follow prescribed treatment, but rather only considered Plaintiff's failure to do so

in assessing his credibility.  However, when the claimant's supposed lack of credibility is at

the heart of the ALJ's finding with respect to a RFC and ultimately his decision to deny

Plaintiff disability, the Court finds this to be a distinction without a difference.  There is

evidence in the record that could support Plaintiff's claim that his noncompliance with the

prescribed medication regimen is excusable and, on remand, the ALJ must address the issue

and take that evidence into consideration before reaching a conclusion as to the extent of

Plaintiff's impairment.

### CONCLUSION

The ALJ omitted  from his decision sufficient detail with respect to his conclusions

regarding Plaintiff's lack of credibility and failed as well to consider whether the extent of

Plaintiff's impairments should be measured without regard to the fact he did not always

adhere to the prescribed medication regimen due to an excusable failure for lack of funds.

Accordingly, the Commissioner's decision is reversed and this case is remanded pursuant to

sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this entry.

IT IS SO ORDERED.

Dated: _07/27/2010_

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

**Copies to:**

**Charles D. Hankey**
**charleshankey@hankeylawoffice.com**

**Thomas E. Kieper**
**UNITED STATES ATTORNEY'S OFFICE**
**tom.kieper@usdoj.gov**